```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                   FORT LAUDERDALE DIVISION
                 CASE NO. 0:17-CR-60022-BB-1
 3

 4    UNITED STATES OF AMERICA,

 5            Plaintiff,                   August 17, 2018
                                          9:33 a.m.
 6        vs.

 7    ESTEBAN SANTIAGO-RUIZ,

 8            Defendant.                   Pages 1 THROUGH 45
      _____

 9                    TRANSCRIPT OF SENTENCING
10               BEFORE THE HONORABLE BETH BLOOM
                   UNITED STATES DISTRICT JUDGE
11

12    Appearances:

13    FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                         RICARDO A. DEL TORO, AUSA
14                       99 Northeast 4 Street, Suite 620
                         Miami, Florida 33132
15
                         UNITED STATES ATTORNEY'S OFFICE
16                       LAWRENCE D. LAVECCHIO, AUSA
                         500 East Broward Boulevard, 7th Floor
17                       Fort Lauderdale, Florida 33394

18    FOR THE DEFENDANT:  FEDERAL PUBLIC DEFENDER'S OFFICE
                         ERIC MARTIN COHEN, FPD
19                       HECTOR DOPICO, FPD
                         SOWMYA BHARATHI, FPD
20                       AYANA HARRIS, FPD
                         150 West Flagler Street, Suite 1700
21                       Miami, Florida 33130-1556

22    COURT REPORTER:     Yvette Hernandez
                         U.S. District Court
23                       400 North Miami Avenue, Room 10-2
                         Miami, Florida 33128
24                       yvette_hernandez@flsd.uscourts.gov

25
```

```
1          (Call to order of the Court, 9:33 a.m.)
2              COURTROOM DEPUTY:  Calling Criminal Case Number
3    17-60022, United States of America v. Esteban Santiago-Ruiz.
4              Counsel, please state your appearances for the record.
5              MR. DEL TORO:  Good morning, Your Honor.  Rick Del
6    Toro and Larry LaVecchio on behalf of the United States.  And
7    with us at counsel table is Special Agent Michael Ferlazzo of
8    the Federal Bureau of Investigation.
9              THE COURT:  Good morning to each of you.
10             MR. COHEN:  Good morning, Your Honor.  Eric Cohen,
11   Hector Dopico, Sowmya Bharathi, and Ayana Harris, from the
12   Federal Defender's Office, on behalf of Mr. Santiago-Ruiz.
13             THE COURT:  Good morning to each of you as well.
14             And may I have the name of the Probation officer
15   that's present in the courtroom.
16             PROBATION OFFICER:  Good morning, Your Honor.  Kathryn
17   Gomez on behalf of Probation.
18             THE COURT:  Good morning, Officer Gomez.
19             Mr. Santiago-Ruiz, as you know, the purpose of this
20   morning's proceeding is to determine an appropriate sentence in
21   your case, a sentence that is sufficient but is not greater
22   than necessary.
23             You were before this Court on May 23rd of this year.
24   At that time, you pled guilty to 11 counts of a 22-count
25   Indictment.  Counts 1 through 5 charged you with violence in an
```

1   international airport causing death, in violation of 18 United

2   States Code, Section 37, Subsection (a), Subsection (1).

3       Counts 6 through 11 charged you with violence at an

4   international airport causing serious bodily injury, in

5   violation of 18 United States Code, Section 37, Subsection (a)

6   Subsection (1).

7       In exchange for your offer and agreement to plead

8   guilty to Counts 1 through 11, and the other terms of the Plea

9   Agreement, the United States has agreed to dismiss the

10   remaining counts of the Indictment following your sentencing.

11       Although you understand and acknowledge that with

12   respect to each of Counts 1 through 5, the statutory maximum

13   penalty is death.  Given that the death penalty is not being

14   sought by the Government, under the terms of the Plea

15   Agreement, the maximum penalty as to these counts is life

16   imprisonment.

17       You acknowledge that, in addition to any sentence

18   imposed, the Court must order that you pay restitution to the

19   victims of your offenses.  You agree that you will disgorge and

20   pay to the Court Clerk for the Southern District of Florida,

21   for the purpose of distributing restitution to victims of the

22   crimes, any monies, in whatever form, paid to you or on your

23   behalf to another in return for writing, interviews,

24   documentaries, movies, or other information disclosed by you,

25   including, but not limited to, access to you, photographs, or

1    drawings of or by you or any type of artifact or memorabilia.

2          Pursuant to Federal Rule of Criminal Procedure

3    11(c)(1)(C), the United States and you agree that the following

4    sentence is the appropriate disposition of this case:

5          As to each of Counts 1 through 5, the parties jointly

6    agree that the Court should sentence you to life imprisonment,

7    with each to be served consecutively to one another.  As to

8    each of Counts 6 through 11, the parties jointly agree that the

9    Court should sentence you to 20 years' imprisonment, with each

10   term to be served consecutively to one another and

11   consecutively to the sentence imposed as to each of Counts 1

12   through 5.

13         Thus, the United States and you jointly agree that the

14   Court should impose a total sentence of five consecutive life

15   sentences, followed by 120 years' imprisonment in this case.

16         The United States and you have agreed that this is a

17   substantively reasonable sentence in this case.  These

18   agreements and understandings were presented to the Court, and

19   the Court deferred acceptance until it had an opportunity to

20   hear from the victims and the next of kin of the decedents.

21         In preparation for today's hearing the Court has

22   received and reviewed the following items.  I will refer to

23   each by docket entry, since each was filed for record.  Docket

24   Entry 125 and the Plea Agreement; Docket Entry 126 is your

25   Factual Proffer Statement; Docket Entry 129 is the Preliminary

1    Order of Forfeiture; Docket Entry 134 is the Draft Disclosure

2    of the Presentence Investigation Report; Docket Entry 135 are

3    filings from Asjad Khan.  The Court received as well in

4    chambers the documents and a flash drive.

5           Docket Entry 141 is the Final Order of Forfeiture;

6    Docket Entry 142 is the Final Addendum 1 Disclosure of the

7    Presentence Investigation Report; and Docket Entry 143 is the

8    Final Addendum 2 Disclosure of the Presentence Investigation

9    Report.

10          Throughout these proceedings, the Court has received

11   under seal and reviewed your medical records, Docket Entry 42,

12   61, 75, 89, 96, 101, 106, 115, 132, 137, and 145, eleven

13   separate filings.  In addition, the Court held an evidentiary

14   hearing to determine that you were competent to proceed.

15          Have you had a full opportunity to review each of

16   these documents with your attorneys, Mr. Cohen and Mr. Dopico?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Do you need any additional time, sir?

19          THE DEFENDANT:  No.

20          THE COURT:  Are there any additional documents that

21   the Court should have received and reviewed in preparation for

22   today, Mr. Cohen?

23          MR. COHEN:  No, Your Honor.

24          THE COURT:  Mr. Del Toro?

25          MR. DEL TORO:  No, Your Honor.

```
 1          THE COURT:  And Mr. Cohen, is there any legal reason
 2   why sentence should not be imposed today?
 3          MR. COHEN:  No, ma'am.
 4          THE COURT:  As the Court did defer sentencing to have
 5   an opportunity to hear from any of the victims or the next of
 6   kin, we'll first certainly begin with those individuals and
 7   then we'll turn the argument first to the Defendant.
 8          MR. LAVECCHIO:  Thank you, Your Honor.
 9          The family members of the deceased victims who are
10   identified in Counts 1 through 5 of the Indictment, as well as
11   all of the injured victims alleged in Counts 6 through 11 of
12   the Indictment, were invited to attend today's hearing at
13   Government's expense, and several chose to do so.
14          We have here today Ms. Ann Andres.  A-N-D-R-E-S.
15   She's the surviving spouse of Terry Michael Andres, who is the
16   deceased victim identified in Count 5 of the Indictment.  She
17   is here with her daughters, Ryan Kim and Whitney Rogers, and
18   they do not wish to address the Court this morning.
19          We also have Edward Amzibel.  A-M-Z-I-B-E-L.  He is
20   the surviving spouse of Mary Louise Amzibel, who is the
21   deceased victim identified in Count 1 of the Indictment.  And
22   Mr. Amzibel was also the seriously injured victim alleged in
23   Count 11 of the Indictment.  He is here with his children, his
24   son, Edward, also named Edward Amzibel, and his daughter
25   Melissa Beauchamp.  B-E-A-U-C-H-A-M-P.  And they would like to
```

1    address the Court.  Ms. Beauchamp would like to address the

2    Court on behalf of the family.

3                THE COURT:  Of course.

4                MR. LAVECCHIO:  Ms. Beauchamp?

5                THE COURT:  Good morning to each of you.

6                MS. BEAUCHAMP:  Good morning, Your Honor.  Thank you

7    for taking the time in hearing us today.

8                We all know our parents are going to die.  We expect

9    it to be from illness or old age.  We hope that they are safe

10   and warm in their beds.  We hope we get a moment with them

11   before they go.  But there is nothing, nothing that can prepare

12   you for the day when you receive the phone call informing you

13   that your mother has been shot, gone in a second from a bullet.

14   You do not get a chance to say good-bye.  You do not get a

15   moment to say one last:  "I love you, Mom."  You get nothing.

16   And there is silence.

17               It starts with the FBI agent on the other end of the

18   phone.  Then you hear the echoes of your own sobs coming back

19   through the phone receiver.  You feel as though you've been

20   punched in the gut and you're gasping for air.  Then comes the

21   realization.  The realization that you realize that the agony

22   of the prior 12 hours was not going to end as you hoped, as you

23   had prayed.  You realize that you have to get yourself

24   together.  You need to call your family to inform them of what

25   happened.  You start wondering how you're going to break the

```
 1    news to your father, who was also shot and is unaware that his
 2    wife of over 45 years is gone.
 3            Once the dust settles, you try to resume life like
 4    before, and yet nothing is the same as before.  Your entire
 5    life is not like before.  You have new challenges to face.  You
 6    have a grieving family to comfort.  Now, life is consumed with
 7    medical appointments, medical procedures, hours in waiting
 8    rooms, victim compensation phone calls, medical bills, and too
 9    many memories to process.
10            Over the next several months, you do nothing but wait
11    for news.  You wait to hear for more information from the
12    Attorney General's Office.  You read more and more information
13    in the press.  It's an ongoing investigation, not an episode of
14    "CSI."  Nothing here is going to get wrapped up in an hour.
15            You are constantly compelled to search the Internet
16    for new information.  First, you locate the diagram the Sun
17    Sentinel published showing where the victims were found in the
18    airport.  Based on that diagram and conversations with your
19    father, you are able to confirm a picture you found on the
20    Internet of your dead mother.
21            Despite all of this, there is nothing more -- there is
22    one more realization.  Your greatest fear has yet to come; the
23    day you have to see the person responsible for your newfound
24    nightmare in court.  You are prepared -- as you prepare to go
25    to court, you start processing all the information you've
```

```
1    absorbed.  Your brain starts to repeat bits and phrases that
2    plucked a nerve.  They start with a quiet whisper.  But as the
3    day goes by, and you get closer to sentencing, they blare in
4    your head.  The words he said scream in your mind.  "I don't
5    know.  I wasn't thinking."
6         Now I'm here today in court to try to grapple with
7    that response.  It is a response I get from my eighth-grade
8    students.  "Why didn't you do your homework?"  "I don't know."
9    "Why did you throw the paper at Logan?"  "I don't know."  "Why
10   did you shoot 14 people?"  "I don't know."
11        I have thought a better answer might come from a
12   28-year-old Army veteran who traveled from Anchorage, Alaska to
13   Fort Lauderdale, Florida.  It's astonishing to me that someone
14   who can give an elaborate tale of mind control and ISIS chat
15   rooms could not come up with a better answer than that.  "I
16   don't know.  I wasn't thinking."
17        What kind of answer is that, "I don't know, I wasn't
18   thinking"?  Your lack of thinking has caused my family, and
19   many other families, grief beyond repair.  You robbed a wife
20   from a husband, a mother from a daughter, a mother from her
21   son, a grandmother from her grandchildren, a sister from her
22   brother, and a friend from her friends.
23        Every day, I'm forced to watch my father grieve.
24   You've taken a happy-go-lucky man, so filled with vibrancy in
25   life, and changed him to a man haunted by constant memories of
```

1    the past.  You altered the course of the future they had

2    planned together.  My parents were set to travel the world,

3    watch their grandchildren grow up, watch their own children

4    grow old, and celebrate more wedding anniversaries, birthdays,

5    holidays, and so much more.  You robbed them of that.

6          My parents were entwined in each other's lives.  They

7    once took great pride in their home, and now it's a place my

8    father wants to escape because every detail of that house holds

9    a memory he once shared with my mother.  What was once a loving

10   home is now just a house.  And for my father, it has become a

11   suffocating tomb which causes him constant heartache.

12         When my father looks into the mirror each day, he can

13   see the constant scars of that painful day.  They are left like

14   lines carved into stone.  It is evident in his smile, as half

15   his teeth are now missing.  His nose is not as straight as

16   before and he sounds a bit different when he talks.  Foods that

17   he once enjoyed he no longer can eat.  He has phantom pains

18   from the nerve endings that were damaged from the bullet you

19   shot into him.  All of this has aged my once-ageless father and

20   forever altered his appearance, and I am blessed that you did

21   not take him from me too.  Yet, because of your poor choices, I

22   no longer have a mother, my best friend, my confidant, my

23   encourager, my support system, and my role model.  She's gone.

24         You have single-handedly turned my world completely

25   upside down.  Who am I to go to when I have a parenting

1    question?  Who am I to talk to first thing in the morning on my

2    way to work or on my way home?  Who is going to call me and ask

3    about our grandson?  Who is going to go to the movies with me?

4    You've robbed me of so many more memories to share with my mom.

5    This was supposed to be the time of our lives to go to spa

6    retreats and mother-daughter trips, the time of our lives, so

7    to speak.  My son is getting older and I felt I had more time

8    to spend with her.  Now she's gone and I cry myself to sleep at

9    night.  She is no longer going to be there for birthdays and

10   holidays.  I can no longer hug her and feel her hug me back.

11          My last memory of her was hugging her before she left.

12   I remember giving her a big, long hug in my kitchen.  That's my

13   last memory of her.  And you robbed me of the final good-bye.

14   What I find unfair is that you get to talk to your mom every

15   two weeks about family business and your son.  Maybe you should

16   not have that privilege.  You robbed me of my very privilege

17   you have.  You robbed my son of that privilege, as it's such a

18   simple one; a grandson being able to speak to his grandmother

19   and a daughter talking to her mother.

20          Although you have robbed me of my incredible mother, I

21   will not allow you to rob me of my life.  I refuse to be

22   consumed by ill feelings toward you.  I have found an inner

23   strength within me and I am forging on, keeping my family

24   together.  We miss my mom every day.  And now our solace is

25   knowing that one day we will be reunited with her.

```
 1              Thank you.

 2              THE COURT:  Thank you, Ms. Beauchamp.  I know how

 3      difficult that must have been.

 4              Mr. LaVecchio?

 5              MR. LAVECCHIO:  Your Honor, also present is Julie

 6      Steckley.  S-T-E-C-K-L-E-Y.  She is the seriously injured

 7      victim alleged in Count 6 of the Indictment.  She's here with

 8      her husband, James Steckley, and Mr. Steckley would like to

 9      address the Court on his behalf and on behalf of his wife.

10              THE COURT:  Of course.

11              Good morning, Mr. Steckley.

12              MR. STECKLEY:  Good morning.

13              Oh.  First of all -- first, as a veteran, I would like

14      to apologize for the lack of support provided to our returning

15      veterans.  To take young men and women and expose them to the

16      brutality of today's combat and warfare, and expect them to

17      return home like nothing has changed in their lives, is a total

18      travesty.  It can't just be turned off and erased from their

19      memories.

20              To you, I'm sorry that the opportunities for help

21      couldn't help you.  I'm sorry we were unable to recognize a

22      young man in real trouble.  I'm sorry for all the hard times

23      you had leading up to the day you changed everyone's life with

24      your senseless attack.

25              So many families were devastated by your actions,
```

1    yours included.  Your baby will grow up without a father

2    because of the choices you made.  I've truly felt sorrow in my

3    heart for you because I don't believe you were born a hardened

4    killer.  However, when you planned and executed this act like a

5    terrorist attack, fired the first shot, injured and killed

6    innocent people, there was no going back.  I can only hope that

7    you will realize the hurt and devastation you have caused so

8    many people.  And with that realization, you will reflect on

9    that day each and every day you changed all of our lives for

10   the worst.  I do hope God can forgive you because I'm not sure

11   I will be able to.

12        Now I'd like to read a statement from my wife:

13        "Every morning when I wake up I take a shower and look

14   down at the hole in my shoulder, I'm reminded I will never be

15   the same person I once was.  I cannot go into large groups of

16   people or buildings that are enclosed without having a panic

17   attack, thinking someone is going to shoot me.  There are still

18   days I struggle with depression and don't want to get out of

19   bed.  I could easily stay inside my house for weeks at a time

20   because I am scared to go outside.  I've been diagnosed with

21   PTSD.  Loud noises can set me off.  I can't enjoy the simple

22   things, 4th of July fireworks, or even watch television.

23        "I'm now on medication and go see a therapist, which

24   is helping.  I will never be able to jump in my car and say:

25   'Let's go.' It takes me weeks to talk myself into it.  My

1    family has also had to adjust to me becoming a different

2    person.  If I am in a store, I'm afraid someone is going to

3    jump out and shoot me.  I no longer feel safe anywhere, and I

4    am mad at you for that.

5         "We used to love to get on a plane and go on some new

6    adventure.  You took that away from me.  I am slowly overcoming

7    my fears.  It's the only way I don't let you win anymore.  I

8    have never felt as helpless as I have in this past year and a

9    half."

10        Thank you, Your Honor.

11        THE COURT:  Thank you, Mr. Steckley.

12        MR. LAVECCHIO:  Your Honor, Kari Oehme, O-E-H-M-E, is

13   the surviving spouse of Michael John Oehme, the deceased victim

14   identified in Count 2.  And Ms. Oehme is also the seriously

15   injured victim alleged in Count 10.  She provided a statement

16   that she asked us to read to the Court this morning.

17        THE COURT:  Of course.

18        MR. LAVECCHIO:  "To the coward who murdered my husband

19   and our daughter's father:

20        "On January 6th, 2017, my husband and I flew to Fort

21   Lauderdale to take a cruise for a nice week of rest and

22   relaxation.  We are hardworking people who get limited vacation

23   each year.  You decided to end our happiness by shooting me in

24   the back and shooting him in the eye, killing him instantly.

25        "My husband's name is Michael Oehme.  He was 57 years

1   old at the time you murdered him.  He was in the prime of his

2   life and we were making plans to retire and live the good life

3   for many years to come.  You took that away from us.  We were

4   married for 31 years.  He was a great man, a great husband, and

5   a great father.  Because of you, he is going to miss some of

6   the greatest moments of a person's life.  He will never be able

7   to walk his daughter down the aisle when she gets married.  He

8   will never know the joys of being a grandfather and he will

9   never be able to enjoy a life of retirement after working for

10  well over 40 years.

11      "You have also deprived me and my daughter of his

12  support and caring.  We always knew we could call on him if we

13  needed help or anything.  Mike was my soulmate and my best

14  friend.  We were the perfect couple and you took all that away

15  with a shot of a single bullet.  I healed physically from your

16  trying to kill me, but my heart is forever broken, as is our

17  daughter's.

18      "How could you walk into a room of innocent people and

19  start shooting?  What would possibly make you think that was

20  something you could do?  It is the most cowardly thing anyone

21  could do.  We had no chance against your bullets.  We had no

22  chance to fire back.  We had nowhere to hide.  If you wanted to

23  kill so badly, why didn't you kill yourself?  Why take so many

24  lives of people who you did not know, ruin so many family's

25  lives in a matter of seconds?  You were in the US military.

1   Wasn't your job to protect the people of the United States?

2   Instead, you decided to kill them?  I will never understand.

3          "Mike was a loving, caring, smart, funny, fun-loving,

4   adventurous man.  Mike had integrity and never spoke an untruth

5   to anyone.  He could be trusted to do what he said he was going

6   to do and do it right.  The list could go on and on with his

7   many attributes.  He had a great passion for his family and

8   animals.  He would do anything to save an animal.  We adopted

9   several dogs with disabilities.  And for his memorial, over

10  $1,500 was given to our local Humane Society in his name.  We

11  saw just how much Mike was loved by the outpouring of support

12  we received from all the people who knew him.  He touched many

13  lives.  We miss him every single minute of every single day.

14         "The greatest joy in his life was seeing us smile when

15  he would surprise us with a trip to somewhere we had never seen

16  before.  He believed that traveling was important for our

17  daughter to learn about other places and cultures, and he made

18  sure she did.  We were going to retire and travel.  You made

19  sure that will never happen.

20         "Mike possessed all the qualities you don't.  You are

21  a coward and the devil's right-hand man.  Murdering people is

22  the greatest sin of all.  The first commandment:  'Thou shall

23  not kill.'

24         "We will never forgive you for destroying our lives.

25  I want you to sit in your cell every day and remember the name

```
 1    Michael Oehme.  Every day, think of the lives you destroyed.  I
 2    hope you live a long, long life so you are haunted by your
 3    actions each day.  Death would have been an easy way out for
 4    you.  Now you will never know the joys that Mike and I and
 5    Andrea had.  You will never enjoy watching your child grow.
 6    You will never travel and enjoy the world around you.  You will
 7    never know what true love is.  But I am certain on the day you
 8    die your soul will rot in eternal damnation for what you have
 9    done."
10         That's on behalf of Kari and her daughter Andrea
11    Oehme.
12         THE COURT:  Thank you.
13         MR. LAVECCHIO:  We also received a statement from the
14    family of Olga M. Woltering.  She is the deceased victim
15    identified in Count 3, and her family asked that we read this
16    statement to the Court.
17         THE COURT:  Certainly.
18         MR. LAVECCHIO:  "Like most people in this situation,
19    no words can describe the pain of the loss of our loved one,
20    but we cannot let her passing go without at least trying to
21    give her a voice in these proceedings.  She, along with the
22    others who were injured or whose lives were taken
23    indiscriminately by a cowardly act of violence deserve to be
24    heard.  However, she is not here to address you.  I am sure she
25    is totally confused by what happened that day and why.  While
```

1    she would speak of forgiveness, backed by her strong faith and

2    belief in Jesus Christ and a benevolent God and Holy Spirit,

3    she would wrestle, as we all do, with how evil infects some and

4    allows this to happen.

5        "Olga Mabel Warren Woltering had a loving husband of

6    almost 65 years, four grown children, eight grandchildren, and

7    six great-grandchildren.  She was a devout Christian and had an

8    intense faith.  She was loved by many.  She was a brave woman

9    who found the love of her life early and found the courage in

10   that love to leave her family and country behind to start a new

11   life.

12       "She had experienced the horror of World War II and

13   the Blitz and knew how to do without.  Her new life meant

14   crossing the ocean several times, as our military family was

15   relocated every three to four years.  This was before it was

16   commonplace to do so and snail mail was the only way to connect

17   with her English family.  She came from a common family by

18   English standards and was proud of her heritage and a proud

19   lioness with her children and their families.

20       "She became a US citizen soon after marrying, and was

21   just as proud of her citizenship and the ideals and values her

22   new country stood for.  She enjoyed life and reveled in her

23   family and church community, always joining in church

24   activities such as Cursillo, always the first to dance when

25   music was available, always patting children on the back for

1   their accomplishments, always smiling, always put together and

2   never allowing whatever pain she was experiencing to dampen her

3   spirits.

4          "This is the lady that was excited to be heading for

5   her favorite vacation experience, sitting in a wheelchair with

6   a tip for the attendant, waiting for my father to retrieve

7   their luggage, who was brutally, and seemingly without thought

8   or remorse, taken from this life by a gun, held by a man who

9   never should have been allowed to have one, in a moment no one

10  can account for.

11         "Forgiveness can be offered on her behalf, but it is

12  our Creator that holds that forgiveness that will determine, as

13  Roman Catholics say in their confession prayer:  'The loss of

14  heaven and pains of hell.'"

15         I don't believe, Your Honor, that any other victims

16  are present in the courtroom.

17         Thank you.

18         THE COURT:  Thank you, Mr. LaVecchio.

19         Mr. Santiago-Ruiz, you have the opportunity, if you

20  choose, to speak directly to the Court.  You may certainly do

21  so.  If there are individuals that are present on your behalf,

22  that would like to speak directly to the Court, they may

23  certainly do so.  I'm certain that Mr. Cohen or Mr. Dopico will

24  speak on your behalf, but I did want to give you that

25  opportunity.

1          MR. COHEN:  Your Honor, if I may?

2          THE COURT:  Certainly.

3          MR. COHEN:  There is nothing we can do to make the

4     pain go away.  But there are some comments that I think are

5     significant, and I think the reason that they're significant is

6     not because we're asking the Court to mitigate the sentence in

7     any way.  Of course, we can't.  Mr. Santiago-Ruiz has accepted

8     responsibility for his acts.  He has pleaded guilty.  He

9     initiated the plea negotiations knowing that he was going to be

10    sentenced to serve the rest of his life in prison.

11         But people -- the Court at the change of plea, and

12    certainly the family members today, have expressed some

13    question about why this occurred, what he was thinking, what

14    his motivation was.  So the comments are meant as an

15    explanation to Your Honor, to the families, and maybe

16    understanding the cause might make their perception of him

17    somewhat different.

18         Mr. Santiago-Ruiz committed a horrible act on January

19    6th of last year, and there is no denying that.  And for the

20    rest of his life, however long he lives, he will forever be

21    defined by the 85 seconds that these incidents occurred at the

22    airport.  And again, he has acknowledged the magnitude of what

23    happened by offering to plead guilty and accepting multiple

24    consecutive life terms.  And again, he understands that he will

25    spend the rest of his life in prison.

```
 1            But although he committed a horrible act, there are --
 2    there is indication that he is not a horrible person.  He is a
 3    loving son.  He is a loving sibling.  He is a loving nephew.
 4    He is a loving partner to his girlfriend and he is a loving
 5    father for his not-yet-two-year-old son, who, as indicated, he
 6    will never see outside a prison setting.  But probably the best
 7    reflection of his value as a person comes from the members of
 8    his National Guard unit that we reached out to as part of our
 9    mitigation investigation.
10            Mr. Santiago-Ruiz joined the National Guard as part of
11    a family legacy that began with his grandfather that he wanted
12    to perpetuate.  And as part of our investigation, we reached
13    out to the men that he served with in Iraq.  And quite frankly,
14    we had no idea what response we were going to get.  And quite
15    frankly, we were expecting somewhat of a hostile response.
16            But each of the eight individuals that we spoke to,
17    the eight individuals who served beside him in Iraq, were all
18    incredibly supportive and actually offered, at their own
19    expense, to come and testify on his behalf had we gone to
20    trial.  And Mr. Santiago-Ruiz has asked us to express to those
21    individuals his apologies for any blemish he may have made on
22    that unit's reputation.
23            These were proud men who fought together in combat.
24    They described to us their common experiences in Iraq,
25    including an explosion that killed two of their unit members.
```

```
1    They described for us the effects of their service, as noted by

2    one of our speakers this morning, one of our family members, on

3    all of them, including Mr. Santiago-Ruiz.  And I think it's

4    their loyalty to him under the circumstances that bring us to

5    court today that speak volumes of their integrity, but also

6    speak volumes about Mr. Santiago-Ruiz, that these individuals,

7    despite the harm that he has caused, are still willing to rally

8    around him and show support for him.

9             In our written submission, in our meeting with the

10   local US Attorney's Office, in our meeting with the Department

11   of Justice, there have been two primary themes of mitigation.

12   One is Mr. Santiago-Ruiz is severely mentally ill.  We're not

13   sure of the cause.  It could have been related to his service

14   in Iraq and losing his 62-year-old father nine months after his

15   return to Puerto Rico.  But we know that he is ill.  We know

16   that not only from the doctor's reports that were submitted to

17   the Court, but also from anecdotal reports that have been

18   provided to us as part of our investigation.

19            I think it's fairly well known from media reports that

20   in November of 2016 Mr. Santiago-Ruiz went to the FBI in

21   Anchorage, Alaska because he believed that he was being

22   surveilled by government agencies.  The government sent him for

23   an evaluation, and that was the first time that he was

24   diagnosed with a psychotic disorder.  And again, that disorder

25   and that diagnosis remains till today from the medical staff,
```

1    the psychological staff over at FDC.

2          At the change of plea, Your Honor asked why he did

3    what he did, and he gave, as the first witness this morning

4    alluded to, a rather stumbling response.  And yes, maybe his

5    words were not very artful.  Part of that may have been our

6    fault in not preparing him for the question.  Part is that he

7    is a stranger to public speaking and not comfortable doing it.

8          But besides what was quoted this morning, he also

9    referred to messages in his head.  And what those messages are

10   is what he told the psychologist -- psychiatrist -- excuse

11   me -- at the Broward County Jail less than 24 hours after this

12   incident.  That there was an algorithm being controlled by the

13   FBI and the CIA, and he was receiving orders as to what to do,

14   and that was why he acted why he did.  And he was still

15   actively psychotic when he told the doctor that and reported it

16   right away.

17         So the answer to the Court's question, and the answer

18   to some of the questions that have been posed, the reason why

19   he did what he did -- and there's no justification for it and

20   we're in no way seeking to condone it, but he was receiving

21   command hallucinations and that was why he did what he did.

22         Fortunately, the doctors at FDC have found an

23   appropriate medicine regimen for him and his prognosis is good.

24   As you've heard when Dr. Holmes testified here at the change of

25   plea hearing and at the competency hearing, he's living a

1  relatively normal life without any kind of disciplinary

2  reports.  So unfortunately, the medication was not provided to

3  him -- or this type of medication was not provided to him or he

4  did not realize the significance of what was going on in his

5  head while he was in Alaska.  But now there is -- not a cure,

6  because he will never be cured, but at least a way of

7  controlling his behavior and the things that he was hearing in

8  his head.

9         We're not going to presume what went into the Attorney

10 General's decision not to authorize death in this case.  We're

11 hopeful that at least part of the consideration was a

12 recognition that persons who suffer from severe mental illness,

13 which, as Dr. Holmes described.  Is a debilitating disease, are

14 less culpable than those persons who don't suffer from such an

15 illness.

16        Recently, there's been growing support in many areas,

17 including the American Bar Association, to treat people with

18 severe mental illness, like those with intellectual

19 disabilities and people who are juveniles, when they commit a

20 homicide, and to make these individuals ineligible for the

21 death penalty.  How that plays out in the future, of course, we

22 don't know.  But I think there is a recognition that people

23 with severe mental illness are in some ways different from

24 those who aren't.

25        The second major thing that we've stated and relied

1   upon throughout the course of these proceedings is remorse,

2   which, of course, culminated in Mr. Santiago-Ruiz's offer to

3   plead guilty and accept a life sentence.  And understandably,

4   there may be some people who are cynical and feel that that may

5   have been lawyer generated and not genuine remorse by

6   Mr. Santiago-Ruiz.  But in that first meeting with the

7   psychiatrist at the Broward County Jail, again, 14 hours after

8   the incident, before appointment of counsel, Mr. Santiago-Ruiz

9   had already expressed his remorse for the horrible crime that

10  he had committed.  And those were his words, as expressed to

11  the doctor there.

12         So this is not anything that he was encouraged to say

13  by us, that he was encouraged to say by anybody else.  This was

14  true and genuine remorse for what he had done after his head

15  cleared up and he understood the full consequences of his

16  actions.

17         So hopefully knowing that information, and knowing

18  that his remorse had its genesis very early on after what he

19  did, he has asked that -- on his behalf that we express for him

20  his apologies to the family and friends of Ms. Amzibel, to

21  Ms. Woltering, Ms. Timmons, Mr. Oehme, and Mr. Andres, for the

22  anguish his acts have caused them.  He has similarly asked that

23  we convey for him his apologies to Ms. Steckley, Mr. Gonzalez,

24  Mr. Timmons, Mr. Prather, Ms. Oehme, and Mr. Amzibel for the

25  pain he has caused them and their families.  He has also

```
1    further asked us to express his apologies to anybody at the

2    airport who was traumatized or otherwise affected by his

3    conduct.

4           This has been a very enlightening experience for him

5    in terms of his understanding of his illness.  And as the

6    medicine took effect, and he met with his Defense team and

7    met -- read the documents that we gave him, and understood what

8    he did, he was -- to say disheartened would be an

9    understatement, an overwhelming understatement.  He does

10   acknowledge it.  He is prepared to accept the Court's sentence.

11          I would just add that his family also asked us to send

12   their sympathies to all who have been affected in this case, as

13   do each member of our Defense team.

14          Thank you, Your Honor.

15          There are some family members here.  I do not believe

16   that they wish to speak to the Court.  And because

17   Mr. Santiago-Ruiz has asked us on his behalf to state his

18   apologies, I don't believe he wants to speak either.

19          THE COURT:  And that was my question, Mr. Cohen.  Does

20   Mr. Santiago-Ruiz wish to express his sentiments directly?

21          MR. COHEN:  If I could have a second.

22      (Pause in proceedings.)

23          MR. DOPICO:  No, Your Honor.  He's unable to at this

24   point.

25          THE COURT:  Mr. Cohen, do any of the family members
```

```
 1   wish to speak directly to the Court?
 2              MR. COHEN:  No, Your Honor.  They're here just to show
 3   their support.
 4              THE COURT:  I want to ensure, before Mr. Del Toro
 5   speaks, that we address any objections to the Presentence
 6   Investigation Report, including the facts and the calculation
 7   of the guidelines.  I understand that there were objections in
 8   the form of clarifications and corrections.  And have they all
 9   been resolved?
10              MR. COHEN:  They have, Your Honor.
11              THE COURT:  Are there any further objections?
12              MR. COHEN:  No, Your Honor.
13              THE COURT:  On behalf of the Government?
14              MR. DEL TORO:  No objections on behalf of the
15   Government.
16              THE COURT:  Then the Court accepts the facts contained
17   in the Presentence Investigation Report, as well as the
18   Probation officer's calculation of the advisory guidelines.
19              Mr. Cohen, is there anything further on behalf of
20   Mr. Santiago-Ruiz?
21              MR. COHEN:  No.  Thank you, Your Honor.
22              THE COURT:  Mr. Del Toro?
23              MR. DEL TORO:  Thank you, Your Honor.
24              Your Honor, on January 6th, 2017, the Defendant,
25   Esteban Santiago-Ruiz, murdered five men and women, most of
```

```
 1    them elderly.  He attempted to murder and shot at least six

 2    other persons, whom he gravely injured, and he changed all of

 3    their lives forever.  However, the path of destruction that he

 4    left behind was much broader that than what he did to these

 5    eleven victims.  He destroyed the lives of surviving husbands,

 6    wives, children, grandchildren, and other loved ones, who will

 7    never see their murdered relative.  He traumatized dozens of

 8    innocent people who were simply picking up their luggage on

 9    their way to a vacation or going home on that day.

10         Prosecutors and agents have traveled throughout the

11    country to talk to some of these people, many of these people.

12    And they told us of the nightmares, the fear of public places,

13    the emotional struggles, and everything that they have faced

14    since the Defendant carried out that attack in 2017.

15         Because of the great devastation that he has caused

16    the parties have agreed to recommend to the Court that he be

17    sentenced to five consecutive life sentences and 120 years

18    consecutive to that.  The parties have, in fact, agreed that

19    this is a substantively reasonable sentence because of the

20    tremendous seriousness of this case, and the facts and the case

21    law support that conclusion.

22         I want to go through the factors -- sentencing factors

23    that are required for the Court to consider under 18 USC

24    Section 3553(a).

25         First, let's talk about the nature and circumstances
```

1    of the offense.  First, the Defendant engaged in extensive

2    premeditation in this case.  This wasn't a snap judgment or a

3    situation where somebody snaps mentally.  He purchased a gun

4    case eight days before the attack.  He purchased a one-way

5    ticket to Fort Lauderdale three days before the attack.

6            In the days before the attack, he disposed of many of

7    his personal belongings, making preparations for what might be

8    the end of his life, and he wiped his computers clean.

9            He boarded two different planes on January 5th and

10   6th, and traveled from Anchorage, Alaska to Minneapolis,

11   Minnesota to Fort Lauderdale to carry out the attack.  Once he

12   arrived at Fort Lauderdale Airport, he retrieved the gun case

13   from airline personnel, went into a bathroom, entered the stall

14   and loaded the firearm.  He then walked the length of the

15   terminal to a baggage carousel area that was crowded with the

16   most victims.  And then he methodically shot and killed five

17   people and seriously injured six others, traumatizing dozens

18   and dozens of others.  At one point in the attack, he even

19   stopped and he reloaded his gun and then he resumed shooting,

20   killing people and injuring others.

21           He admitted to FBI agents after the attack that he had

22   planned it.  This was not a situation where somebody with a

23   mental illness just snaps all of a sudden.  This was a very

24   calculated, methodical, premeditated attack, with devastating

25   consequences.

1              I'd like to turn to the personal characteristics of

2       the Defendant.  Both parties have stipulated, and the Court has

3       found, that the Defendant is, in fact, mentally competent to

4       stand trial.  He understands the nature of the proceedings

5       against him and he was able to assist in his defense.

6              Additionally, the parties have stipulated, and the

7       evidence establishes, that at the time of the offense, he was

8       sane; in other words, he understood the nature and consequences

9       of his actions and he knew that what he did was wrong.

10             While he's been diagnosed with schizophrenia, and that

11      is a serious mental illness, he has also admitted that he used

12      numerous hallucinogenic drugs, including LSD, marijuana,

13      ecstasy, mushrooms, and salvia.  Other witnesses interviewed

14      have also reported that he used synthetic marijuana, commonly

15      known as spice, which is an extremely potent hallucinogen.

16             As the PSI points out in Paragraph 146, some of these

17      hallucinogenic drugs can cause lasting mental problems.  And we

18      submit to the Court that the Defendant's own bad choices in

19      engaging in extensive hallucinogenic drug use contributed to

20      the hallucinations and mental problems that he has dealt with.

21             Furthermore, he refused to seek mental health

22      treatment after psychiatric hospitalization in Alaska at Alaska

23      Psychiatric Institute.

24             Additionally, he received medical attention at the

25      Veteran's Administration Medical Hospital in Puerto Rico, near

1    his hometown, and he was scheduled for therapeutic appointments

2    for various issues and he failed to show up to those

3    appointments.  So his case was closed.  Again, demonstrating

4    the bad choices that he made.

5          He did serve honorably in Iraq.  And we talked to many

6    of the service members who served along with him.  And while

7    they all agreed that he was a good soldier in Iraq, they also

8    said they were extremely disappointed.  One said:  "Our job is

9    to protect Americans and what he did was kill Americans."

10         I'm going to turn now to additional 3553 factors,

11   Judge.  First, the Court must fashion a sentence that reflects

12   the seriousness of the offense.  And as I stated earlier, an

13   armed attack has left an enormous trail of destruction,

14   suffering, pain, unlike any other case, except for the most

15   serious mass murders.  So this case stands on its own in a

16   different class than any case the Court sees on a regular basis

17   or will ever see.  He ended lives, injured, maimed, and

18   disfigured victims, and he traumatized numerous others.  Words

19   cannot express the suffering he has caused and the seriousness

20   of his multiple crimes.  Few crimes will ever compare to the

21   seriousness of these offenses.

22         The recommended sentence that the parties propose is

23   also consistent with a factor of promoting respect for the law

24   and providing just punishment for the offenses.  The public

25   must know, Your Honor, that egregious criminal acts like this

1    one that the Defendant committed will be punished

2    proportionately and severely.  The agreement of the parties to

3    the serious sentence we recommend reflects that these sentences

4    constitute just and proportional punishments for the offenses,

5    no more serious than what is necessary to promote justice.

6           I'll turn to the next factor, which is:  The Court

7    must fashion a sentence that affords an adequate deterrent to

8    criminal conduct.  The recommended sentence will also provide

9    an adequate deterrent to other individuals like the Defendant

10   who, for whatever reason, plan and premeditate a horrific

11   attack such as this.  Once again, potential attackers need to

12   know that they will never again be free if they ever commit

13   such a heinous act.

14          And finally, I'd like to address the factor of

15   protection of the public from further crimes by the Defendant.

16   The magnitude of these crimes defy comprehension and they make

17   him a continuing threat to society.  There's simply no

18   guarantee that someone who has committed such a devastating

19   attack will not do so again.  The incapacitation of dangerous

20   criminals is one of the most important goals of sentencing laws

21   as codified in this sentencing factor, and the recommended

22   sentences will meet that goal.

23          Thank you, Judge.

24          THE COURT:  Thank you, Mr. Del Toro.

25          Mr. Del Toro, on behalf of the Government, you've

1   advised the Court of Mr. Santiago-Ruiz's extensive

2   premeditation.  You've advised that he methodically shot and

3   killed and maimed others, he left an enormous amount of

4   destruction and this is a case that stands on its own.  You've

5   stated that words cannot express the suffering he has caused

6   and the magnitude of his crimes defy comprehension.

7         Why did the United States not seek the death penalty

8   in this case?

9         MR. DEL TORO:  And Your Honor, that is a decision that

10  is made by the Attorney General.  We're prohibited from

11  discussing internal deliberations of the department.  There are

12  multiple reasons that were presented.  The mitigation packet

13  from the defense was included.  Some of the factors that are

14  considered, obviously, the mental condition of the Defendant.

15  Additional factors are his military service and all of the

16  things that the Defense has brought up.

17        Perhaps most importantly, Judge, all of the deceased

18  victims' next of kin expressed to the Government that they

19  would prefer for a life sentence to be imposed and not to have

20  to go through the trauma of reliving the incident of January

21  7th, 2017 -- January 6th, 2017.  That, I think, weighs very

22  heavily, the fact that the victims and victims' families,

23  particularly the next of kin of the deceased, felt so strongly

24  that they did not want to be re-victimized once again having to

25  go to court, having to go through years and decades of

```
 1    litigation in a case such as this.  And some expressed that
 2    they thought that a life sentence, in fact, would be more
 3    severe than a much easier way out, which would be execution.
 4    That obviously was another factor that weighed very, very
 5    heavily in the determination as well.
 6              THE COURT:  Thank you, sir.
 7              MR. DEL TORO:  And at least one next of kin indicated
 8    that they were personally opposed to the death penalty.
 9              THE COURT:  Thank you, sir.
10              Is there anything further on behalf of the Government?
11              MR. DEL TORO:  Nothing further, Your Honor.
12              THE COURT:  Is there anything further, Mr. Cohen, on
13    behalf of Mr. Santiago-Ruiz?
14              MR. COHEN:  No.  Thank you, Your Honor.
15              THE COURT:  Mr. Santiago-Ruiz, this morning, you heard
16    from several family members and victims of your heinous acts.
17              During the attack, you shot and killed Mary Louise
18    Amzibel, Michael John Oehme, Olga Woltering, Shirley Wells
19    Timmons, and Terry Michael Andres.
20              Mary Louise Amzibel was 69 years old.  She lived with
21    her husband of 45 years, Edward Amzibel, who was also shot and
22    wounded.  They lived in Dover, Delaware.  She was the mother of
23    two children, a son, Edward, and a daughter, Melissa.  She was
24    a grandmother to four children:  Anthony, Aiden, Abigail, and
25    JC.  She was a para educator in the Smyrna School District for
```

1   20 years.  She and her husband were in Fort Lauderdale on their

2   way to a Panama Canal cruise.  Mrs. Amzibel loved to bake and

3   travel.  And her friends described her as the warmest, kindest,

4   sweetest person.

5        Michael John Oehme was 56 years old.  He lived with

6   his wife of 30 years, Kari Oehme, who was also shot and

7   wounded, in Council Bluffs, Iowa.  He was the father to a

8   daughter, Andrea, who once described him as:  "The most amazing

9   man I've ever met."  He was a land surveyor and owner of

10  Boundarylines Surveyors in Omaha, Nebraska.  He and his wife

11  were in Fort Lauderdale on their way to a Caribbean cruise.

12  Michael dearly loved his family and his three dogs and cat.

13       Olga Woltering was 84 years old.  She lived with her

14  husband of 64 years, Ralph Woltering, in Marietta, Georgia.

15  She was the mother of four children, sons Mike, Gary, Tim, and

16  daughter Debbie.  As you heard, she was a grandmother to eight

17  and a great grandmother to six.  Her pastor described her as:

18  "One of the most joyful, loving, caring, and committed people I

19  have ever met."  She and her husband were in Fort Lauderdale on

20  their way to a cruise in celebration of her husband's 90th

21  birthday.

22       Shirley Wells Timmons was 70 years old.  She lived

23  with her husband for 50 years, Charles Timmons, also shot and

24  wounded.  Lived in Senecaville, Ohio.  Shirley and Charles met

25  in the eighth grade and were high school sweethearts.  She was

 1    the mother of three daughters, who described her as the most

 2    loving, passionate mother, who had a love for life and truly

 3    sparkled.  She was a grandmother of eight.  She and her husband

 4    had owned women's clothing stores in Ohio, the Mayfair stores.

 5    She and her husband were in Fort Lauderdale to join the rest of

 6    the family for a cruise.

 7         Terry Michael Andres was 62 years old.  He lived with

 8    his wife of 40 years, Ann Andres, in Virginia Beach, Virginia.

 9    He was the father of two daughters, Ryan and Whitney.  He was

10    the grandfather of three, Riley, Hayden, and Donovan.  Terry

11    has been uniformly described as such a good family man.  He was

12    a radiological control technician at the Norfolk Naval

13    shipyard.  Terry was an avid golfer and tennis player.  He and

14    his wife were in Fort Lauderdale on their way to a Caribbean

15    cruise to celebrate his upcoming 63rd birthday.

16         Injured in the attack were Julie Steckley, Bonifaco

17    Gonzalez, Charles Timmons, Christopher Prather, Kari Oehme, and

18    Edward Amzibel.

19         Julie Steckley suffered a through-and-through gunshot

20    wound to her shoulder.

21         Bonifaco Gonzalez suffered a gunshot wound which

22    grazed his chest and lodged in his arm, severing a major

23    artery, which not only required emergency surgery to stem the

24    bleeding, but also required the transplant of a vein from his

25    leg into his arm in order to repair this artery.

1          Charles Timmons was shot in the head, causing serious

2     injuries and the loss of his left eye.  An emergency

3     craniotomy, the excision of part of his skull, was performed on

4     him to relieve pressure on his brain and to remove damaged

5     brain tissue.  Charles was in a coma for an extended period of

6     time.  His recovery, to this day, has been slow and he

7     continues to suffer cognitive problems affecting his language

8     skills and memory.

9          Christopher Prather suffered a gunshot wound to his

10    left wrist, requiring emergency surgery to reconstruct the

11    bones in that wrist using metal parts.  The bullet missed a

12    major artery in Mr. Prather's wrist by one centimeter.  The

13    bones in his wrist failed to heal properly and Mr. Prather

14    continues to experience pain and numbness in his left hand and

15    has been told by doctors that these symptoms will be permanent.

16         Kari Oehme was shot in the neck.  The bullet fractured

17    two ribs and lodged in her upper back, leaving metal fragments

18    inside her torso.  She has since undergone surgery to remove

19    some bullet fragments in an attempt to relieve the pain caused

20    by her injuries.  She continues, to this day, to experience

21    pain due to nerve damage which she sustained.

22         Edward Amzibel, the husband of murder victim Mary

23    Louise Amzibel, was shot in the upper left nostril and the

24    bullet traveled through his upper right jaw, shattering his

25    jawbone and destroying his teeth and gums.  Mr. Amzibel has

```
1    required multiple surgeries in order to reconstruct his

2    sinuses, palate, and jaw.  He has required three rounds of bone

3    grafts in preparation to have a prosthetic device inserted to

4    replicate his teeth.  This has yet to be accomplished.  His

5    sinuses were damaged to the extent that he requires daily

6    irrigation through his nose in order for him to stave off

7    infections.

8           You heard today, Mr. Santiago-Ruiz, that you robbed

9    these families of memories and experiences.  They had no chance

10   to say good-bye to their loved ones.  You destroyed families in

11   this senseless attack.

12          It is difficult, if not impossible, for this Court to

13   separate the evil in your acts from the evil in the man.  Your

14   evil acts included:  In December of 2016, you purchased a

15   hard-sided pistol case from a sporting goods store in

16   Anchorage, Alaska, after discussing with a manager regarding

17   the specific type of case you needed in order to check a gun

18   onto a commercial airplane.

19          On January 3rd of 2017, you used your Samsung

20   smartphone to access a map of the layout of the Tom Bradley LAX

21   Airport.  On that day, you purchased a one-way airline ticket

22   scheduled to depart Anchorage, Alaska via Minneapolis on

23   January 5th and arrive at the Fort Lauderdale airport on

24   January 6th.

25          Before your departure to Fort Lauderdale, you threw
```

1    out some of your possessions, including personal papers and

2    clothing, which were recovered from the dumpster outside the

3    motel where you had been staying before the attack.  One

4    scratch piece of paper appeared to be a checklist, which

5    included a notation to clean the laptop.

6          On January 5th, you purchased a new Seagate computer

7    hard drive from Walmart and replaced your Toshiba laptop's

8    computer hard drive with a new hard drive which contained no

9    data.  You left the Toshiba laptop with the new blank hard

10   drive at the motel where you were living.

11         On January 5th, you went to the Anchorage airport with

12   no luggage, except your gun case containing a Walther 9mm

13   pistol and two loaded magazines, which you checked with the

14   airline for your flights to Minneapolis and Fort Lauderdale.

15         On January 5th, you boarded the airplane and flew from

16   Anchorage through Minneapolis and arrived at the Fort

17   Lauderdale airport.

18         On January 6th, you then deplaned and walked to the

19   terminal 2 baggage area on the ground floor.  Then you

20   retrieved the gun from the case from the airline's baggage

21   office.  You walked to the terminal 2 west side's men's

22   restroom and you entered a stall.  While in the men's room

23   stall, you loaded the firearm.  You threw away in the trash a

24   shirt, gloves, hat, and the lock with keys and luggage tag

25   which had been attached to the pistol case.  You left behind in

1    the stall the empty pistol case.

2            You then concealed the firearm in your waistband and

3    walked out to the baggage area, heading east to the far end of

4    the terminal.  You then walked between carousels 2 and 3,

5    pulling the firearm from your waistband and firing at victims'

6    heads and bodies 15 times, for approximately 2 minutes; 85

7    seconds of evil.

8            You said nothing as you shot people.  At one point,

9    you ran out of ammunition and you reloaded a second magazine

10   into the firearm.  You then fired all the rounds in the second

11   magazine at your victims.  After shooting all of your

12   ammunition, you dropped the pistol on the floor in lock-back

13   position, meaning that the gun was out of ammunition.

14           And the evil in the man is evident from your

15   statements to law enforcement after your arrest.  You advised

16   you probably would have kept shooting if you did not run out of

17   ammunition.  After a Broward Sheriff's Office deputy asked you

18   how you felt after what had happened that day, you replied:  "I

19   don't feel anything."  You were then asked if you would do it

20   again, and you replied:  "I don't know."  When you were asked

21   if you felt any remorse, you replied:  "Not really."

22           To the victims that have suffered, and are suffering,

23   and the families of Mrs. Amzibel, Mr. Oehme, Mrs. Woltering,

24   Mrs. Timmons, and Mr. Andres, no sentence this Court can impose

25   can ever take back or erase what took place on January 6th,

1    2017.  You have tragically lost a loved one.  You've been

2    maimed.  And there is nothing the Court can do to lessen your

3    grief and pain, and I wish that I could do something more.  You

4    did not deserve this, but I pray that today brings you some

5    closure.

6         Mr. Santiago-Ruiz, you do, in fact, deserve the

7    Court's sentence, the maximum that this Court is permitted to

8    impose in this case.  The Court has certainly considered the

9    statements of all parties, the Revised Presentence Report,

10   which contains the advisory guidelines, and a full

11   consideration of the statutory factors of 18, United States

12   Code, Section 3553(a).

13        As the Defendant does not have the ability to pay a

14   fine, restitution is mandatory and it will be ordered.  And as

15   I understand, it is still in dispute and the Court will set a

16   restitution hearing.  Is that correct, Mr. Del Toro?

17        MR. DEL TORO:  Yes, Your Honor.

18        THE COURT:  Esteban Santiago-Ruiz, the Court accepts

19   the recommendation of the parties and it is the judgment of the

20   Court that you are committed to the Bureau of Prisons to be

21   imprisoned for life.  This life term consists of consecutive

22   terms of life as to each of Counts 1 through 5 and consecutive

23   terms of 20 years as to each of Counts 6 through 11, for a

24   total of 120 years.

25        Since all of the victims' losses are not yet

1    ascertainable, the Court will set a date for a final

2    determination of the victims' losses not to exceed 90 days

3    after today's date, pursuant to 18, United States Code, Section

4    3664, Subsection (d), Subsection (5), and that will be set on

5    Friday, November 2nd, at 1:30 p.m.

6           While the five consecutive life sentences, and the

7    lack of any ability for parole, will not allow any release from

8    imprisonment, as part of the sentence, and upon any release,

9    which is unlikely -- but the Court will place you on supervised

10   release for a term of five years.  This term consists of five

11   years as to each of Counts 1 through 5 and three years as to

12   each of Counts 6 through 11, all such terms to run

13   concurrently.

14          Within 72 hours of any release from the custody of the

15   Bureau of Prisons, you shall report in person to the Probation

16   office in the district where you are released.  You shall

17   comply with all mandatory and standard conditions of supervised

18   release.  That includes not committing any crimes, being

19   prohibited from possessing a firearm or other dangerous device.

20   You shall not unlawfully possess a controlled substance.  You

21   shall cooperate in the collection of DNA.

22          You shall comply with the following special

23   conditions:  The Court's going to order mental health

24   treatment, no new debt restriction, a permissible search, a

25   financial disclosure restriction, and the payment of all unpaid

1   restitutions, fines, and special assessments.

2           It is further ordered that you shall immediately pay

3   to the United States a special assessment of $100 as to each of

4   Counts 1 through 11, for a total of $1,100.

5           Now that sentence has been imposed, Mr. Santiago-Ruiz,

6   do you or your attorneys object to the Court's findings of fact

7   or the manner in which the sentence was pronounced?

8           MR. COHEN:  No, Your Honor.

9           THE COURT:  Mr. Santiago-Ruiz, within your Plea

10  Agreement is the waiver of your right to appeal.  To the extent

11  that it has not been fully waived, let me advise you that any

12  Notice of Appeal must be filed within 14 days after entry of

13  the judgment.  If you're unable to pay the cost of the appeal,

14  you may apply for leave to appeal in forma pauperis, which

15  means there would be no cost to you.

16          Your right, title, and interest in the property

17  identified in the Final Order of Forfeiture, which has been

18  entered by this court, is incorporated by reference herein and

19  that property is forfeited.

20          Mr. Del Toro, does the Government have a motion with

21  regard to the remaining counts?

22          MR. DEL TORO:  Yes, Your Honor.

23          The Government moves to dismiss Counts 12 through 22

24  of the Indictment.

25          THE COURT:  And that motion is granted.

1            Is there anything further on behalf of the Government?

2            MR. DEL TORO:  Nothing from the Government, Judge.

3            THE COURT:  Is there anything further on behalf of the

4    Defendant?

5            MR. COHEN:  Yes, Your Honor.

6            We do have a request.  It seems maybe a bit unusual

7    under the circumstances.  We have done a lot of research into

8    an appropriate to designation for Mr. Santiago-Ruiz, where he

9    may be able to get care for his mental health treatment.  We'd

10   ask for recommendation to USP, the penitentiary at Coleman,

11   where he can apply to become part of the Challenge Program,

12   which would help him in his treatment of his mental illness.

13           THE COURT:  I'll make that recommendation, sir.

14           Is there anything further on behalf of the Defendant?

15           MR. COHEN:  No.  Thank you, Your Honor.

16           THE COURT:  All right, then.  Best of luck to you,

17   sir.

18       (Proceedings concluded at 10:48 a.m.)

19

20

21

22

23

24

25

45

```
 1    UNITED STATES OF AMERICA      )

 2    ss:

 3    SOUTHERN DISTRICT OF FLORIDA  )

 4                    C E R T I F I C A T E

 5         I, Yvette Hernandez, Certified Shorthand Reporter in

 6    and for the United States District Court for the Southern

 7    District of Florida, do hereby certify that I was present at

 8    and reported in machine shorthand the proceedings had the 17th

 9    day of August, 2018, in the above-mentioned court; and that the

10    foregoing transcript is a true, correct, and complete

11    transcript of my stenographic notes.

12         I further certify that this transcript contains pages

13    1 - 45.

14         IN WITNESS WHEREOF, I have hereunto set my hand at

15    Miami, Florida this 27th day of August, 2018.

16

17                    /s/Yvette Hernandez
                      Yvette Hernandez, CSR, RPR, CLR
18                    Certified Shorthand Reporter
                      400 North Miami Avenue, 10-2
19                    Miami, Florida 33128
                      (305) 523-5698
20                    yvette_hernandez@flsd.uscourts.gov

21

22

23

24

25
```